IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MECHANICAL CONSTRUCTION MANAGERS, LLC, d/b/a RIECK SERVICES, :

Plaintiff, :

v.

KEVIN PASCHKA, et al., :

Defendants.

Case No. 3:21-cv-302

JUDGE WALTER H. RICE

---

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DOC #3)

---

On November 17, 2021, and November 29, 2021, the Court conducted an evidentiary hearing on a Motion for Preliminary Injunction ("Motion"), Doc. #3, filed by Plaintiff, Mechanical Construction Managers, LLC, d/b/a Rieck ("Plaintiff" or "Rieck"). Plaintiff's Motion sought preliminary injunctive relief against Defendant, Kevin Paschka ("Paschka"), a former employee, for breach of contract, and against Paschka and Industrial Reliability and Repair, LLC d/b/a Honhorst Services ("Honhorst"), his current employer, for misappropriation of trade secrets under Ohio Revised Code § 1331.61, violation of the Defend Trade Secrets Act, 18 U.S.C. §1836, and conversion. Prior to the hearing, Paschka and Honhorst filed memoranda opposing the Motion, Doc. ##16 and 19, and following the hearing, all parties filed post-hearing briefs. Doc. ##24, 29, 30 and 31.

In a conference call held on December 9, 2021, the Court orally informed counsel of its ruling on Plaintiff's Motion and on December 13, 2021, an Order Sustaining in Part and Overruling in Part Plaintiff's Motion for Preliminary Injunction was filed. Doc. #32. This Decision and Entry sets forth the Court's rationale for its December 13th Order.

## I. Factual Background

### A. The Asset Purchase Agreement

Rieck is an Ohio limited liability company with its principal place of business in Dayton, Ohio. Doc. #1. It provides heating, ventilation, and air conditioning services, as well as mechanical contracting services, to commercial, industrial, institutional, education and residential facilities throughout southwest Ohio and northern Kentucky. *Id.* It employs over 150 employees in both its service and construction divisions. *Id.*

On August 29, 2020, Rieck signed an asset purchase agreement with The Thomas J. Dyer Company ("T. J. Dyer" or "Dyer"), a company located in Cincinnati, Ohio, for the assets of its heating, ventilation and air conditioning ("HVAC") service division. Exhibit 1.[1] Because T. J. Dyer has other lines of business, not all of the Dyer employees went to Rieck. Transcript, November 17, 2021 ("Nov. 17, 2021, Tr."), p. 72. The asset sale amounted to approximately five

[1] Citations to exhibits are those admitted into evidence at the November 17 and 29, 2021, preliminary injunction hearing.

percent of the business of T. J. Dyer. *Id.* In addition to the purchase of the Dyer Service Division's inventory and tangible property, Rieck also purchased the intellectual property including trade names and "all. . . documents, papers, agreements, books of account and other records relating to the inventory, purchasing, sales, customers and employees" of the company's service business. Exhibit #1. According to Christopher Ayers, President of T. J. Dyer, the company first began doing HVAC service business in 2010 when it purchased RPC Mechanical Services ("RPC"). *Id.*, at p. 13. After that 2010 purchase, Ayers stated that RPC was no longer a legal entity and that RPC was a trade name for T. J. Dyer and was used instead of Dyer Service Division because of name recognition in the industry. *Id.*, pp. 76. He later testified, however, that the purchase of RPC by Dyer may have occurred in two phases and that in 2013, RPC may still have been a legal entity and that the dates "may not be aligned exactly." *Id.*, p. 79. Julie Goetz, controller at Rieck, testified that her understanding is that RPC was the same as T. J. Dyer. *Id.*, p. 184.

**B. The RPC Mechanical Agreement**

On November 1, 2013, Paschka signed an agreement entitled "Non-Compete Agreement for Employees of RPC Mechanical Services" ("RPC Agreement"). In this agreement, Paschka agreed, "[I]n consideration" of his "employment. . . with RPC, or one [of] its subsidiaries or affiliates," and for one year following the termination of his employment with RPC, not to (1) compete

with RPC; (2) solicit customers or prospects of RPC; or (3) solicit or recruit employees of RPC. Exhibit 16. In Paragraph 3 of the RPC Agreement, Paschka agreed that this agreement could be assigned "in the event of merger or consolidation of RPC or in connection with the sale of all or substantially all of RPC's business" with "[a]ll of the covenants and agreements" to "inure to the benefit of such successor or assignee." *Id.* Although Paschka, the Sales Manager of the HVAC Service Division at T. J. Dyer, was unsure if he was an employee of RPC Mechanical Services or of Dyer when he signed the RPC Agreement, Exhibit 16, Transcript, November 29, 2021 ("Nov. 29, 2021, Tr."), p. 226, Christopher Ayers testified that the non-compete agreement was between T. J. Dyer and Paschka and that he "was an employee of RPC mechanical that was a division of Dyer." Nov. 17, 2021, Tr., p. 24.

**C. The Rieck Agreement**

Following the asset sale to Rieck of the Dyer HVAC Service Division, Paschka decided to go to Rieck and on August 30, 2020, signed an agreement entitled "Confidentiality/Non-Solicitation Agreement for Employees of the Mechanical Construction Managers, LLC" ("Rieck Agreement"). *Id.*, p. 143; Exhibit 4. In this Agreement, Paschka, who had been in the HVAC service business for over 20 years, Nov. 29, 2021, Tr., pp. 184-187 and 198, agreed not to "disclose, divulge, or reveal . . . or permit any Confidential Information" to be "disclosed, divulged, or revealed" to any third party, any future employer or any competitor

of Rieck. Confidential Information, as defined in the Rieck Agreement, included "information, . . . records, . . . and other trade secrets, . . . not known to competitors and outside third parties" and information about Rieck's customers, prospective customers and its "purchasing and pricing. . . strategies and financial data. . ., business methods, practices and procedures." Exhibit 4. This information, however, is subject to disclosure by Paschka if it has become known without any action by him in breach of the Agreement, is generally known to the public or in the relevant trade or industry, is disclosed pursuant to a court order or becomes lawfully known to him independent of and unrelated to his employment by Rieck. *Id.* Paschka further agreed that upon termination of his employment with Rieck, he would return all documents and property belonging to Rieck in his possession, custody or control including any Confidential Information. *Id.*

In addition to this non-disclosure of Confidential Information and return of company documents and records, the Rieck Agreement required that Paschka would not solicit, for one year after his termination of employment, any person or entity that was a Rieck "customer or active customer prospect" to provide services in competition with them. This provision applied to those customers or active customer prospects with whom Paschka "had contact" with "during the two years preceding" his termination of employment. *Id.* Finally, Paschka agreed, for one year following the termination of his employment with Rieck, not to solicit any of their employees or interfere with their job performance. *Id.*

Before he signed the Rieck Agreement, Paschka testified that he attended a meeting where Douglas Walker, Rieck's Vice-President and Chief Operating Officer ("COO"), answered questions from T. J. Dyer employees concerning changes as a result of its acquisition of the Dyer Service Division. Nov. 29, 2021, Tr., pp. 189-190. At this meeting, Dan Etler, an employee of Honhorst and former employee of Rieck and T. J. Dyer, testified that Walker stated, in response to a question from a fellow union member of Etler, "everything is going to stay the same" including any "overscale packages" that existed. Etler explained that "overscale packages" or "packages" was the pay to union members in excess of the required union minimum. *Id.*, pp. 87-89. Paschka also testified that the Rieck Vice-President and COO stated that everyone at Dyer would keep their same "roles" going forward. *Id.*, p.189. Based on these statements made by Walker, Paschka testified he signed the Rieck Agreement. *Id.*, p. 191.

**D. Paschka's August 5, 2021, Resignation from Rieck**

On September 29, 2020, approximately one month after signing the Rieck Agreement and attending the Walker meeting with Dyer employees, Paschka learned from Kristin Vandivier, Rieck's Sales Manager, that he was being demoted from Sales Manager to Service Account Manager. *Id.*, p. 192. In this new position, he could no longer quote projects and replacements, could not sign contracts and could not review invoices for errors. *Id.*, p. 193. He was also told that although his pay would remain the same as it was at T.J. Dyer, his

commission percentages would be decreased, his 401k employer match would be reduced and he would be required by Rieck to pay $1,500 annually for health insurance despite being covered on his wife's policy. *Id.*, pp. 193-194 and 209. As a result, Paschka testified that his income decreased by approximately $15,000. *Id.*, p. 209. As the primary contact for Rieck's service contract customers, Paschka was responsible for renewing the existing contract base and drafting, on a monthly basis, the renewal letters. Nov. 30, 2021, Tr. p. 43. He told Rieck's Sales Manager that if he was not able to quote projects and return to his former job duties as a Sales Manager in six months, he would leave Rieck. *Id.*, pp. 208-209.

On August 5, 2021, approximately 11 months after signing the Rieck Agreement, Paschka gave two weeks' notice to Rieck, via email, that he was resigning. Exhibit 7. His email did not state where he was going. *Id.* Two days before he told Rieck of his resignation, Paschka told Kelli Nicoloff, his contact at Clarion Manufacturing Corporation ("Clarion") located in Walton, Kentucky, that he was leaving. *Id.*, pp. 245-246 and 248. On August 3, 2021, he also emailed to his personal email account a Rieck proposal for a Clarion project including a Rieck service estimation template. *Id.* pp. 246; Exhibit 5. On August 4, 2021, Paschka emailed Rieck's maintenance estimation document for maintenance contract customers known as "Quest Tasking" to his personal email account. Exhibit 6. On August 5, 2021, Paschka also emailed to his personal email account the Dyer preventative maintenance estimation spreadsheet. Exhibit 8.

After announcing his resignation on August 5, 2021, Paschka emailed to his personal email account the following documents: (1) on August 6, 2021, a heating service quote for JonLe Heating Service, Exhibit 9; (2) on August 8, 2021, emails and a repair quote for Christ Hospital in Burlington, Kentucky, Exhibit 10; (3) on August 9, 2021, a "Prospect List" which Rieck purchased from T. J. Dyer, Exhibit 11; and (4) on August 10, 2021, photographs of Clarion equipment, identical to Exhibit 5, without the service estimation spreadsheet. Exhibit 12. Regarding the Prospect List, Exhibit 11, Paschka testified that he had prepared this document both before and during his employment at T. J. Dyer.

Rieck testified that the documents sent by Paschka to his personal email were proprietary, confidential and protected from disclosure. Rieck's IT director, Thomas Graham, testified that the customer lists and estimation materials are highly protected with only 10 percent of the company having access to them. *Id.*, pp. 86-87. Additionally, Kristin Vandivier, testified that Exhibit 6, the Quest Tasking document, was developed over 30 years, is up-dated by an in-house Rieck analyst and used daily by their sales representatives to generate new business, re-budgeting and expanding existing business. *Id.*, p. 221. She testified that this document is not publicly disseminated, Rieck employees have limited access to it and it includes internal labor costs, gross profit margins and a preventive maintenance material default, a mark-up of the total labor cost if anything is missed in a quote. *Id.*, pp.227-236.

Sometime after August 11, 2021, Paschka became the Director of Sales at Honhorst, a Cincinnati, Ohio, company that had been acquired in December 2019, by Industrial Reliability and Repair, LLC ("IRR"). Nov. 29, 2021, Tr., pp. 120 and 184. Paschka testified that he met with representatives of Honhorst in July 2020, and although he had talked to other mechanical service contractors, he did not pursue them prior to accepting employment at Honhorst. *Id.*, pp. 250 and 253. He further testified that he has not used Rieck's Quest Tasking, Exhibit 6, and did not share it or their customer list with anyone at Honhorst. Other than Riecks's desired profit margins which were stated in his job description, Paschka testified he did not learn anything about the competitive bidding process at Rieck that he did not know from his over 20 years in the industry. *Id.*, pp. 216 and 204. He also testified that he has not solicited any of the industry contacts that he learned of while at Rieck, has never intentionally told anyone about Rieck's business practices and has not recruited any employees from Rieck to join Honhorst. *Id.*, pp. 206 and 213. Rieck testified that although Honhorst had only become a competitor in the HVAC service industry for a few months, by early August 2021, five of Rieck's employees had gone to work at Honhorst. Nov. 17, 2021, Tr. 150-151.

Phillip Tackett, the Operations Manager of Honhorst, testified that Honhorst does manufacturing, fabricating and servicing of pressure vessels and related equipment. *Id.*, p. 119-120. In April or May 2021, it decided to enter the HVAC plumbing and servicing business. *Id.*, p. 121. He further testified that the first time

he saw Rieck's estimation spreadsheet and customer list was at the evidentiary hearing. *Id.* p. 123.

**II. Standard of Review**

A preliminary injunction is an extraordinary equitable remedy "intended to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Because discovery has either not occurred or is incomplete, the movant "is not required to prove his case in full at a preliminary injunction hearing." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848 (6th Cir. 2017 (citing *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). A plaintiff must, however, make a clear showing that it is entitled to such relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The Court's granting of a preliminary injunction is guided by four factors: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent an injunction; (3) whether the balance of the equities tips in its favor; and (4) whether the injunction is in the public's interest. *Id.*, at 20; *RECO Equipment, Inc. v. Wilson*, No. 20-4312, 2021 WL 5013816, at *2 (6th Cir. Oct. 28, 2021).

Although the four factors are balanced "and are not prerequisites to be met," *Certified Restoration*, 511 F.3d at 542, Rieck "must show at least some likelihood of success on the merits and that it likely will suffer irreparable harm" if Paschka and Honhorst are not enjoined. *RECO Equipment*, 2021 WL 5013816, at *2

(citations omitted). In analyzing whether the balance of the equities tips in favor of the issuance of a preliminary injunction, the Court considers not only the harm that Rieck would suffer if Paschka and Honhorst are not enjoined, but also the harm that Paschka and Honhorst would suffer if an injunction is granted. The harm, as alleged by Plaintiff, is Paschka's continued breach of two employment agreements and his and Honhorst's unlawful use of Rieck's proprietary and confidential company documents and/or misappropriation of its trade secrets. The harm to Paschka includes his inability to work for Honhorst and from being employed in the HVAC service industry for at least one year, as well as requiring him to return documents and information that he asserts he either created or are not Rieck's trade secrets. Finally, the Court considers the harm that may result to third parties. *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982) ("The irreparable injury [the plaintiffs] will suffer if their motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting of the injunctive relief.").

In this case, federal law governs Plaintiff's claim of misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"),18 U.S.C. § 1836, and Ohio law governs its claims for breach of contract, misappropriation of trade secrets, Ohio Revised Code § 1331.61, and conversion. The Court will, therefore, follow the decisions of the Ohio Supreme Court, and, if no controlling opinion exists, will "attempt to predict how that court would decide the issue." *Great Lakes Brewing Co.*, 860 F.3d at 849 (quoting *In re Amazon.com, Inc., Fulfillment*

*Ctr. Fair Labor Standards Act (FLSA) & Wage & Hour Litig.*, 852 F.3d 601, 610 (6th Cir. 2017). Decisions of Ohio's appellate courts are also viewed as persuasive unless it is shown that the Ohio Supreme Court would decide the issue differently. *In re Dow Corning Corp.,* 419 F.3d 543, 549 (6th Cir.2005).

Because Rieck seeks a preliminary injunction on breach of contract, violation of the Ohio Uniform Trade Secrets Act, Ohio Revised Code § 1331.61, the DTSA and conversion, each claim will be analyzed separately under each of the four factors for a preliminary injunction. *RECO Equipment,* 2021 WL 5013816 at *2

## III. Legal Analysis

### A. Likelihood of Success on the Merits

To satisfy the first factor, likelihood of success on the merits, Rieck "must show more than a mere possibility of success." *Certified Restoration*, 511 F.3d at 543. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Medical Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

#### 1. Breach of Contract Claim - RPC Agreement

Plaintiff asserts a breach of contract claim against Paschka based on the RPC Agreement. It contends Paschka entered into this non-compete agreement with T. J. Dyer and that it was later assigned to Rieck in the August 29, 2021, Asset Purchase Agreement. Paschka, at the time of signing, was an employee of T. J. Dyer and RPC was merely a "trade name" for the company. Paragraph 3 of the

RPC Agreement states that Paschka agreed to an assignment of this agreement in the event of a "merger or consolidation of RPC" or (2) a "sale of all or substantially all of RPC's business." The evidence established, however, that there was no merger or consolidation of T. J. Dyer and Rieck. Moreover, according to Dyer's President, the asset sale with Rieck amounted to only a five per cent sale of the company. Because the terms in the RPC Agreement "are clear and unambiguous, this [C]ourt cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander v. Buckeye Pipe Line Co.*, 374 N.E. 2d 146, 150, 53 Ohio St. 2d 241 (Ohio 1978).

Although Rieck may have purchased some of T. J. Dyer's customers and arguably also purchased the RPC Agreement signed by Paschka as a result of its August 29, 2020, asset purchase agreement with T. J. Dyer, Plaintiff cannot enforce the terms of the RPC Agreement. Paschka's obligation for one year following his termination of employment with T. J. Dyer not to compete with RPC, solicit its customers or prospects, or solicit or recruit its employees is not assignable to Plaintiff because there was neither a "merger or consolidation of RPC" or a "sale of all or substantially all of RPC's business." Accordingly, based on the language of the RPC Agreement, Rieck has not shown a likelihood of success on the merits as to Paschka's breach of the RPC Agreement.

**2. Breach of Contract Claim – Rieck Agreement**

Rieck also a brings a breach of contract claim against Paschka for his breach of the August 30, 2020, Rieck Agreement. This Agreement required that Paschka

(1) not disclose any "Confidential Information," as defined in the Agreement, to any third party or competitor; and (2) return to Rieck, when he left the company, all of its documents and property in his possession, custody or control. Additionally, the Agreement contained two non-compete covenants prohibiting Paschka from soliciting (1) Rieck's customers or active customer prospects and (2) its employees. Both of these non-solicitation covenants expired one year after Paschka left Rieck.

Before analyzing whether Rieck has shown a likelihood of success on the merits as to its breach of contract claim of the Rieck Agreement, the Court will first address Paschka's argument that this Agreement is invalid because he was fraudulently induced to enter into it as a result of statements made by Rieck's Vice President and COO at a meeting with the T. J. Dyer employees.

**a. Paschka's fraudulent inducement claim**

To prevail on a fraudulent inducement claim, Paschka must establish (1) a false representation concerning a fact, (2) knowledge of the falsity of the representation or utter disregard for its truthfulness, (3) intent to induce reliance on the representation, (4) justifiable reliance upon the representation, and (5) injury proximately caused by the reliance. *Barnes v. Reserve Energy Exploration, 68 N.E.3d 133, 139* (Ohio Ct. App. 2016) (citing *Burr v. Stark Cnty. Bd. of Comm'rs,* 23 Ohio St. 3d 69, 491 N.E.2d 1101 (1986)).

Paschka's affirmative defense fails for any number of reasons, chief of which is that Walker's alleged representation concerning pay was not made to

Paschka but to a union employee concerning the union's rate of pay, thus negating the required element of justifiable reliance on the part of Paschka. Moreover, Walker's alleged statement that "nothing would change" was a future representation made to the entire group with no showing of intent to deceive Paschka. *Tibbs v. National Homes Constr. Corp.*, 52 Ohio App.2d 281, 286, 369 N.E.2d 1218 (1977) ("Fraud cannot be predicated upon promises or representations relating to future actions or conduct.").

Accordingly, the Court finds that Paschka was not fraudulently induced to enter into the Rieck Agreement.

**b. Breach of contract and noncompete covenants**

For Plaintiff to show a likelihood of success on the merits for Paschka's alleged breach of the Rieck Agreement, Plaintiff must show (1) the existence of valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resulting damages. *Becker v. Direct Energy, LP*, 112 N.E.3d 978, 988 (Ohio Ct. App. 2018). Because Paschka signed the Agreement on August 30, 2020, "in consideration of his employment with Rieck and the salary, wages, and other benefits to be paid," Exhibit 4, the contract is valid. Additionally, there is no evidence that Rieck ever failed to perform its obligations under the Agreement from the date Pashaka signed it until his voluntary resignation on August 5, 2021. Finally, although the evidence did not show that Plaintiff had suffered any monetary damages as a result of Paschka's breach of the Agreement, it did show a threat of harm because of Paschka's new employment with a competitor.

*Proctor & Gamble v. Stoneham*, 140 Ohio App. 3d 260, 274, 747 N.E. 2d 268 (2000) (threat of harm justifying injunctive relief exists where employee "with a detailed and comprehensive knowledge of an employer's trade secrets and confidential information" leaves employment and takes similar position with competitor).

As to the two noncompete covenants in the Agreement, non-solicitation of Rieck's customers and active customer prospects and non-solicitation of its employees, Plaintiff must show that these two covenants are reasonable. *Raimonde v. Van Vlerah* 42 Ohio St. 2d 21, 325 N.E. 2d 544 (1975).

Under Ohio law, reasonable restrictions are enforceable and are enforced as written. *Id.* "A covenant restraining an employee from competing with his former employer . . . is reasonable if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Id.* at syllabus 2. If a covenant not to compete is unreasonable, courts are empowered to modify or amend the terms to create a reasonable covenant between the parties. *Id.* at 26; *Rogers v. Runfola & Assocs., Inc.*, 57 Ohio St. 3d 5, 8, 565 N.E.2d 540, 543 (Ohio 1991); *Murray v. Accounting Ctr. & Tax Servs., Inc.*, 178 Ohio App. 3d 432, 898 N.E.2d 89, 93 (Ohio Ct. App. 2008 ("In Ohio, reasonable noncompete agreements are enforced, and unreasonable noncompete agreements are enforced to the extent necessary to protect an employer's legitimate interest.").

In making a determination whether the restrictions in the Rieck Agreement are reasonable, Ohio law considers a number of factors:

> whether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possesses confidential information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and experience, whether the benefit to the employer is disproportionate to the employee's detriment, whether the covenant destroys the employee's sole means of support, whether the employee's talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment.

*Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir.1992) (citing *Raimonde*, 42 Ohio St. 2d at 21).

**c. Confidential Information and return of Rieck's documents**

In the Rieck Agreement, Paschka agreed not to disclose, divulge or reveal Confidential Information, as defined in the Agreement, to anyone, including a competitor such as Honhorst. Rieck testified that this information was proprietary and would be invaluable to a competitor. Although there was no evidence that Paschka actually disclosed, divulged or revealed any Confidential Information to anyone, a threat of disclosure exists since Paschka, formerly a Sales Manager with T. J. Dyer and a Service Account Manager with Rieck, is working as the Director of Sales for Honhorst, a competitor. *Stoneham*, 140 Ohio App. 3d at 274.

Although the Court finds that the definition of Confidential Information in the Agreement is broad[2] and may be difficult to enforce given Paschka's length of time in the HVAC service industry and length of time and responsibilities at Rieck,

[2] The definition of Confidential Information likely includes information that would also be subject to misappropriation of trade secrets under state and federal law.

Plaintiff has shown a likelihood of success on the merits for a breach of this provision.

The Rieck Agreement also contained a provision requiring Paschka to return Rieck's documents and information in his "possession, custody or control, in whatever form," when he left the company. Rieck testified that Paschka breached this provision by emailing, to his private email account, the following documents: Exhibits 6 (Quest Tasking), 8 (Preventative Maintenance Estimation spreadsheet), 10 (concerning Christ Hospital), 5 and 12 (concerning Clarion Equipment), 11 ("Prospect List") and 14 (Rieck's customer list).

The Court finds that Rieck has shown that Paschka, with the exception of Exhibit 11, violated this provision of the Agreement. Although Rieck argued that it purchased the Prospect List, Exhibit 11, from T. J. Dyer in the Asset Purchase Agreement, Paschka, who had over 22 years in the HVAC service industry and less than one year at Rieck, prepared this list based on his years in the industry, including those at T. J. Dyer. Accordingly, the Court finds, with the exception of Exhibit 11, that Plaintiff has a likelihood of success on the merits for its breach of contract claim as to this provision.[3]

[3] In the Court's Order of December 13, 2021, Doc. #32, Paschka was ordered to (1) return all copies in his possession, custody, or control to Plaintiff of these Exhibits; (2) delete and permanently remove these documents from any computer in his possession, custody or control; and (3) to file with the Court a Certification of Compliance. *Id.*, PageID#261 and 263. Although not a signatory to the Rieck Agreement, the Court also ordered Honhorst to file a Certification of Compliance. *Id.*, PageID#264.

**d. Non-solicitation of Rieck customers and Rieck employees**

In the restrictive covenant concerning customers and active customer prospects, Paschka agreed not to solicit, "any person or entity that was a customer or active customer prospect. . . and with whom" Paschka "had contact during the course" of his employment "for the purposes of providing or offering to provide" any "services or products in competition" with those offered by Rieck. Based upon the language in the Agreement, the non-solicitation time period is from August 30, 2020, through August 19, 2021.[4] Although specific in certain respects, this noncompete covenant does not define the word "contact."

According to Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/compilations (last visited January 18, 2022), contact is defined as a "connection" or a "communication." Paschka, who had over 20 years in the industry and less than one year at Rieck, was "demoted" from his position as Sales Manager at T. J. Dyer to Account Sales Manager at Rieck. While he was employed at Rieck, and unlike his position at T. J. Dyer, he was not permitted to quote projects and replacements, sign contracts or review invoices for errors. Additionally, at Rieck he performed a significant amount of paperwork transferring T. J. Dyer service contracts to Rieck.

---

[4] Although the Rieck Agreement states that the non-solicitation for its customers or active customer prospects is "for the two years preceding the termination" of his employment with Plaintiff, because Paschka was employed at Rieck for less than one year, from August 30, 2020, through August 19, 2021.

Plaintiff argued that Paschka should be prohibited from soliciting any of its customers or active customer prospects, which included those on the Prospect List purchased by Rieck from Dyer, Exhibit 11, and former T. J. Dyer customers with whom Paschka had "contact" by sending out renewal letters stating that they were being transferred to Rieck and that their rates would increase by five percent. Paschka was not paid commission on these renewals. Under *Raimonde*, Rieck has not shown that its non-solicitation restraint is not greater than is required for its protection, does not impose undue hardship on Paschka and does not injure the public. *Raimonde*, 42 Ohio St. 2d at 21. Additionally, by applying the *Raimonde* factors, it is clear that "the benefit to" Rieck "is disproportional to the detriment to" Paschka and that the non-solicitation of the Prospect List customers and the customers to whom Paschka sent the five percent increase letters "operates as a bar" to Paschka's "sole means of support." *Raimonde*, 42 Ohio St. 2d at 25. Given that Paschka was employed in the HVAC service industry for over 20 years before coming to Rieck, it cannot be said that his talent which Rieck "seeks to suppress was actually developed during the period of employment." *Id.*

Pursuant to Ohio law, *Raimonde*, Ohio St.2d at 26, the Court will modify the terms of the non-solicitation agreement to create a reasonable noncompete covenant between the parties. Accordingly, Paschka's "contact" with Rieck's customers and active customer prospects is limited to "contact" to which he was personally involved, directly or indirectly, in the submission of a competitive bid

on behalf of Rieck. The Court does not find Paschka's sending out of letters while he was employed at Rieck to former customers of T. J. Dyer advising them of an increase in services to be competitive bidding.[5] With this modification of the noncompete covenant of non-solicitation of customers or active customer prospects in the Rieck Agreement, Plaintiff has a likelihood of success on the merits of its breach of contract claim. Absent this modification, Rieck has not shown a likelihood of success on the merits as to this noncompete covenant.

Concerning Rieck's noncompete covenant of non-solicitation of its employees or interference with their performance, Rieck testified that five of its employees had gone to Honhorst to work between approximately May 2021 and August 2021. Although Paschka testified that he had not recruited any of Rieck's employees to work at Honhorst, he is now working for an employer in a position that causes him to compete directly with Rieck so that "an actual threat of harm exists." *Stoneham*, 140 Ohio App. 3d 278. The Court finds that this noncompete covenant is reasonable since the one-year restraint on solicitation of Rieck's employees or interference with their performance is no greater than is required for Rieck's protection, does not impose an undue hardship on Paschka and does

[5] In its filing of February 5, 2022, Motion for Clarification of Order Sustaining in Part and Overruling in Part Motion for Preliminary Injunction of Plaintiff (Doc. #32); Request for Hearing, Doc. #47, Plaintiff seeks clarification of whether the Court's Order, Doc. #32, restricts Paschka in his communication and solicitation with Rieck's customers cultivated during his employment with Plaintiff or whether it extends to those customers of T.J. Dyer that became customers or prospective customers of Plaintiff after the August 30, 2020, asset purchase agreement. The Court believes the above description clarifies the Court's Order, Doc. #32, and responds to Plaintiff's Motion. Doc. #47. If counsel disagree, it may seek further clarification from the Court.

not injure the public. *Raimonde*, 42 Ohio St. 2d at syllabus 2. Based on the above, the Court finds that there is a likelihood of success on the merits in favor of Plaintiff for breach of contract by Paschka of the Rieck Agreement as to the non-solicitation of Rieck employees or interference with their performance for the time period of August 30, 2020, through August 19, 2022.

**3. Defend Trade Secrets Act and Ohio Uniform Trade Secrets Act**

Plaintiff has shown a likelihood of success on the merits as to its claims against Paschka for violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1836, and the misappropriation of trade secrets under Ohio's Uniform Trade Secrets Act ("OUTSA"), Ohio Revised Code § 1331.61. Because the definition and requirements of both the DTSA and OUSTA are essentially the same, the Court will consider these federal and state law claims together. *Just Funky, LLC v. Boom Trendz*, LLC, No. 5:21-cv-1127, 2021 WL 2635377, at *6 (N.D. Ohio June 25, 2021) ("The definition of a trade secret and requirements for establishing misappropriation of trade secrets are substantially the same under the DTSA and [Uniform Trade Secrets Act]."); *Ukrainian Future Credit Union v. Seikaly,* No. 17-CV-11483, 2017 WL 5665960, at *10 n.11 (E.D. Mich. Nov. 27, 2017) ("The DTSA has a similar trade secret definition [as in] the UTSA and was intended to be substantially similar to the UTSA definition.").

To state a DTSA claim for injunctive relief, Rieck must establish: (1) the existence of a protectable trade secret; and (2) misappropriation of the trade secret by the defendant. *PPS Service Group, LLC v. Eckert*, No. 1:18-CV-727, 2019

WL 3927232, at *4 (S.D. Ohio Aug. 20, 2019) (Mag. J. Bowman) (citations omitted); *Ukrainian Future Credit Union v. Seikaly*, E.D. Mich. No. 17-cv-11483, 2017 U.S. Dist. LEXIS 194165, at *20, 2017 WL 5665960 (Nov. 27, 2017) (same). Information under the federal trade secret act can be characterized as a "trade secret" only when it "derives independent economic value. . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from" it. *See*, 18 U.S.C. § 1839(3).

Similarly, under the OUTSA, misappropriation is defined as the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;" or the disclosure or use of another's trade secret without the other's consent, if the discloser/user acquired it by improper means,[6] in breach of a duty of secrecy, or with the knowledge that it was a trade secret and had been acquired by accident or mistake. Ohio Rev. Code § 1333.61(B). *Allied Erecting and Dismantling Co., Inc. v. Genesis Equipment & Mfg., Inc.*, 805 F.3d 701 (6th Cir. 2015); *Kendall Holdings, Ltd. v. Eden Cryogenics*, LLC, 521 Fed. Appx. 453 (6th Cir. 2013) *see also List Industries, Inc. v. Umina,* No. 3:18-CV-199, 2021 WL 2916967, at 12 n. 11(S.D. Ohio July 12, 2021) (Rose, J.). The OUTSA permits the issuance of an injunction for an actual or threatened misappropriation of a trade secret. Ohio Rev. Code § 1333.62.

[6] Pursuant to § 1333.61 (A), improper means "includes theft, bribery, misrepresentations breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."

The "question of whether something is a trade secret is a question of fact to be determined by the trier of fact upon the greater weight of the evidence." *Handel's Enterprises, Inc. v. Schulenburg*, 765 Fed. Appx. 117 (6th Cir. 219, 123 (2019) (quoting *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003) (per curiam).

Under the OUTSA, a trade secret is information that "(1) . . .derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," Ohio Rev. Code Ann. § 1333.61(D)(1), and (2) is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* § 1333.61(D)(2). Six factors are used to analyze whether an item requires trade secret protection:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings [affected] and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St. 3d 513, 524-525, 687 N.E.2d 661, 672 (Ohio 1997), superseded by statute on other grounds as stated in *State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 378 (Ohio 2000). "Though no factor is dispositive, a 'business or possessor of a potential trade secret must

take some active steps to maintain its secrecy in order to enjoy presumptive trade secret status.'" *Handel's Enters.*, 765 F. App'x at 122.

Rieck has identified the following eight items that Defendant Paschka sent to himself during the two weeks between announcing his intent to resign from Rieck and his departure as trade secrets. It contends that the unauthorized accessing and taking of those documents violated both the Defend Trade Secrets Act and Ohio's Uniform Trade Secrets Act. These documents are as follows: (1) Rieck's "Quest Taking" spreadsheet which includes pricing information, Exhibit 6; (2) Rieck's "PM Estimation" spreadsheet, Exhibit 8; (3) Rieck's quote and bid submittal for a job with Christ Hospital in Burlington, Kentucky, Exhibit 10; (4) Rieck's "Prospect Lists," Exhibit 11; (5) Rieck's April 14, 2021, assessment and proposal that it submitted to Clarion Equipment, Exhibits 5 and 12; (6) Rieck's customer list containing information (e.g., contact person, telephone numbers, customer assessments, and addresses) for over one thousand customers, Exhibit 14; (7) Bid proposals for several of Rieck's customers, Exhibits 5, 10 and 12; and (8) Estimation formula spreadsheets that Rieck uses to estimate the cost of the construction services that it offers to its customers, which also included Rieck's confidential profit margins, Exhibits 6 and 8.

Based on the above, the Court finds that there is a likelihood of success on the merits as to Rieck's claim under the DTSA and the OUTSA against Defendant Paschka for misappropriation of trade secrets. Although there is presently no evidence that Defendant Paschka has used any of these trade secrets, there is an

"actual threat of harm." *Stoneham*, 140 Ohio App. 3d at 274 (threat of harm "substantially likely to occur" warranting injunctive relief where former employee now at competitor in similar position directly targeted same products he had worked on, set-up "global teams' as he had at former employer and specifically discussed former employer's advertising campaign). The Court also finds that because there was no evidence presented that Honhorst had violated either the DTSA or the OUTSA, there is no likelihood of success on the merits against that Defendant.

**4. Conversion**

Because Plaintiff's state law claim for conversion is preempted by the OUTSA, *Rogers Indus Prods. Inc. v. HF Rubber Mach., Inc.*, 188 Ohio app. 3d 570 936 N.E. 2d 122 (Summit Cty 2010), the Court finds that there is no likelihood of success on the merits for this claim.

**B. Irreparable Harm**

Rieck argues that it will suffer irreparable harm if a preliminary injunction is not issued. This factor is "indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief now as opposed to at the end of the lawsuit." *D.T. v. Sumner County Schools*, 943 F.3d 324, 327 (6th Cir. 2019) (citations omitted). The harm that a movant must show to obtain preliminary injunctive relief must be "both certain and immediate, rather than speculative or

theoretical." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 154 (6th Cir.1991).

The Court finds that Rieck will suffer irreparable harm on its breach of contract claim for the Rieck Agreement, including any breach of the two restrictive covenants therein, on its violation of the DTSA claim and its claim for misappropriation of trade secrets under the OUTSA. Specifically, Rieck has presented substantial evidence that it maintained certain internal protocols so that its customer lists, maintenance estimation document and estimation materials and quotes to customers were highly protected on its servers with only a relatively small number of its employees having access to them. Additionally, its Quest Tasking document, Exhibit 6, was described by Rieck as so important to the company that its disclosure would harm their profitability and give a new company a competitive advantage.

Rieck has also shown that prior to announcing his resignation, Paschka emailed to his personal email account, certain Confidential Information, as defined in the Rieck Agreement, and that after August 5, 2020, he continued to email certain Rieck documents that are trade secrets under the DTSA and OUTSA. Additionally, Rieck testified that Honhorst, although smaller in size than Rieck, is a competitor in the HVAC service industry. By going to Honhorst, a competitor, and assuming the role of Director of Sales, Paschka will have opportunities to solicit customers and active customer prospects of Rieck. "Ohio courts have held that a substantial threat of harm exists when a defendant employee 'possesses

knowledge of the employer's trade secrets and begins working in a position that causes [him] to compete directly with the former employer or the product line that the employee formerly supported.'" *Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1007 (S.D. Ohio 2008) (Marbley, J.) (citing *Jacono v. Invacare Corp.*, No. 86605, 2006 WL 832451, at *7 (Cuyahoga Ohio App. 8th Dist.) (citing *Stoneham*, 140 Ohio App.3d at 267, 747 N.E.2d 268). Finally, because money damages would prove difficult to calculate based on potential loss of customers and prospective customers, Rieck has shown the potential of irreparable harm. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992) (". . . an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate.").

Accordingly, the Court finds that this factor weighs in favor of the issuance of a preliminary injunction.

**C. Balance of the Equities**

In balancing the equities, the Court must also consider the harm that would occur to Rieck if a preliminary injunction is not issued for the Rieck Agreement, and Plaintiff's claims under the DTSA and OUTSA as well as the harm Paschka and Honhorst would suffer if an injunction is issued.

Rieck argues that Paschka should be enjoined from soliciting any of its customers and active customer prospects with whom he had any "contact" with while employed at Rieck. It asserts this contact includes letters Paschka sent while

he was employed at Rieck to former customers of T. J. Dyer advising them of an increase in services. Additionally, Rieck testified at the hearing that Paschka should be prohibited from any contact with all persons or companies on the Prospects List, Exhibit 11, since it purchased Exhibit 11 from T. J. Dyer as part of the Asset Purchase Agreement. Paschka, however, argues that Rieck's interpretation of the non-solicitation covenant of customers and active customer prospects and Exhibit 11 would result in his being unable to work in the HVAC service industry.

As stated earlier in this Decision and Entry, the Court has modified, pursuant to *Raimonde*, 42 Ohio St. 21, the covenant of non-solicitation of customers and active customer prospects so that it is reasonable. Additionally, because the evidence showed that Exhibit 11, the Prospect List, was prepared by Paschka based on his over 20 years in the HVAC service industry, it is excluded from those documents that must be returned to Plaintiff pursuant to the Rieck Agreement. Concerning the Rieck Agreement's non-solicitation of its employees or interference with their performance, Pashka testified that he has not violated this provision and has made no argument that its enforcement harms him.

With the modification to the non-solicitation covenant and the exclusion of Exhibit 11 from the Rieck documents that must be returned to Plaintiff by Paschka, the Court finds that the third preliminary injunction factor weighs in Plaintiff's favor for the breach of the Rieck Agreement.

Plaintiff has shown the harm it will suffer under the DTSA and OUTSA based on Paschka's misappropriation of its proprietary databases and spreadsheets, processes, procedures, and detailed customer lists. As stated earlier, because Honhorst did not receive any of the Rieck documents that Paschka emailed to his personal email account, Honhorst will not be harmed by the issuance of a preliminary injunction under these claims. Similarly, because Paschka will be permitted to keep the Prospect List that he prepared, Exhibit 11, and has not asserted any harm that he would suffer if the Rieck documents are returned, the balance of the equities factor weighs in favor of Plaintiff for its DTSA and OUTSA claims.

**D. Public Interest**

The final factor is whether the public interest would be served in the granting of a preliminary injunction. Ohio law upholds both the sanctity of contracts and the enforcement of reasonable non-compete covenants. Raimonde, 42 Ohio St. 2d at 21; *Nottingdale Homeowners' Assn. v. Darby*, 33 Ohio St.3d 32, 36, 514 N.E.2d 702 (1987) ("[P]ersons have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced."). Moreover, "upholding reasonable contracts is generally in the public interest." *Prosonic*, 539 F.Supp.2d at 1008. Accordingly, the Court finds that that this fourth factor weighs in favor of the issuance of a preliminary injunction for Plaintiff's breach of

contract claims under the Rieck Agreement and its claims under the DTSA and OUTSA.

## IV. Conclusion

For the reasons set forth above, Plaintiff, Mechanical Construction Managers, LLC d/b/a Rieck Services Motion for Preliminary Injunction, Doc. #3, as set forth in further detail in this Court's Order of December 13, 2021, Doc. #32, is SUSTAINED in part and OVERRULED in part.

Date: May 19, 2022

Walter H. Rice
WALTER H. RICE
UNITED STATES DISTRICT JUDGE